## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LAKE TREASURE HOLDINGS, LTD., KAJEER YAR, and
WATERCOLOR VENTURES, LLC,

    Plaintiffs,

    v.

FOUNDRY HILL GP LLC, FOUNDRY HILL
ELECTRONIC TRADING LLC, FOUNDRY HILL
CAPITAL LLC, FOUNDRY HILL TRADING LLC, CP-1
LLC, ULRIC TAYLOR, CHRISTOPHER KLEE,
PROGRESSIVE PACKAGING CORP., MILTON R.
SMITH III, BUTTONWOOD GROUP TRADING LLC,
THREE ZERO THREE CAPITAL PARTNERS, LLC, and
TRIPLE LINE TRADING, LLC,

    Defendants,

    and

FOUNDRY HILL HOLDINGS, LP and CP-1 LLC,

    Nominal Defendants.

C.A. No. 6546-VCL

## MEMORANDUM OPINION

Date Submitted: July 24, 2014
Date Decided: October 10, 2014

Philip Trainer, Jr., Toni-Ann Platia, ASHBY & GEDDES, Wilmington, Delaware;
Robert A. Chapman, Peter M. Spingola, Shannon T. Smith, CHAPMAN SPINGOLA,
LLP, Chicago, Illinois; *Attorneys for Plaintiff Lake Treasure Holdings, Ltd., Kajeer Yar,
and Watercolor Ventures, LLC.*

Evan O. Williford, THE WILLIFORD FIRM LLC, Wilmington, Delaware; Norman J.
Lerum, NORMAN J. LERUM P.C., Chicago, Illinois; *Attorneys for Defendants Foundry
Hill GP, LLC, Foundry Hill Electronic Trading, LLC, Foundry Hill Capital LLC,
Foundry Hill Trading LLC, CP-1 LLC, Triple Line Trading, LLC, and Ulric Taylor.*

David E. Wilks, Thad J. Bracegirdle, Douglas J. Cummings, Jr., WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; *Attorneys for Defendants Christopher Klee and Progressive Packaging Corp.*

**LASTER, Vice Chancellor.**

The plaintiffs invested in a software-based trading business that defendant Ulric Taylor proposed to develop. When the startup failed, they sued. During discovery, they learned that the firm had developed seemingly valuable trading software. Later in discovery, they learned that Taylor had transferred the software covertly to an entity controlled by his longtime friend, defendant Christopher Klee.

From then on, the plaintiffs focused on the software. At trial, they contended that Taylor breached his duty of loyalty by granting Klee a security interest in the software in return for loan proceeds representing a fraction of what Taylor thought the software was worth, followed by an amicable surrender of the software to Klee. They contended that Klee aided and abetted Taylor's breach of duty. They argued that the same facts supported remedies under the Delaware Uniform Fraudulent Transfer Act ("DUFTA"). Premised on an order restoring ownership of the software to the firm, they sought additional remedies under the Delaware Uniform Trade Secrets Act ("DUTSA").

The plaintiffs proved that Taylor breached his duty of loyalty by transferring the software and that Klee aided and abetted the breach. Yet the defendants convinced me at trial that the ostensibly valuable trading software actually was a simplistic arrangement of public domain components and concepts. Given that Taylor and Klee acted as if the software had substantial value, I approached trial skeptical of their strategy. Nevertheless, their expert cogently explained how anyone with moderate skill with computers and basic knowledge of trading could reproduce the software using retail programs and sources freely available on the internet. Despite Taylor and Klee's earlier belief to the contrary, the software did not have any value as intellectual property. The software had not

1

generated any trading profits for the defendants, so there was nothing to disgorge, and the evidence convinced me that the software was not likely to produce trading profits in the future. Consequently, this decision awards nominal damages of $1.00 on the claims for breach of fiduciary duty and aiding and abetting.

Analyzed under DUFTA, Taylor and Klee's conduct constituted a fraudulent transfer. As a remedy, the defendants shall return the software to the firm. Given what trial showed about the software, it is not clear why the plaintiffs want it, but they do, and the firm is entitled to it.

The plaintiffs cannot obtain any relief under DUTSA. The defendants proved at trial that the software was not a trade secret, rendering DUTSA inapplicable.

## I.    FACTUAL BACKGROUND

The parties tried the case over three days. The following facts were proven by a preponderance of the evidence.

### A.    The Foundry Hill Startup

Plaintiff Kajeer Yar and Taylor were friends from college. Years later, Yar found himself working for the Hille Foundation (the "Foundation"), a private, family foundation with approximately $60 million in assets. Yar served as in-house legal counsel and an investment consultant. The Foundation's two trustees were Maggie Hille Yar and Mary Ann Hille. As their names suggest, Maggie was Yar's wife, and Mary Ann was Yar's mother-in-law.

In 2008, Yar and Taylor discussed having the Foundation back Taylor in starting a new firm under the name "Foundry Hill." They contemplated that its first venture would

2

be to develop algorithmic trading strategies and deploy them in electronic trading. Yar convinced his wife and mother-in-law to invest.

A lengthy series of entity formations and substitutions ensued. The results were (i) Foundry Hill Capital, LLC, a Delaware limited liability company, which served as Taylor's management company; (ii) Lake Treasure Holdings, Ltd. ("Lake Treasure"), a Cayman Islands limited liability company, which served as the Foundation's investment vehicle for projects with Taylor; and (iii) Foundry Hill Holdings LP (the "Partnership"), a Delaware limited partnership, that served as the holding company for interests in business-specific Foundry Hill entities. For simplicity, this decision refers to the final entities rather than any of their predecessors.

Taylor ended up with control over the Partnership and a majority of its equity. He controlled the Partnership through his control over Foundry Hill GP LLC (the "General Partner"), a Delaware limited liability company, which was the Partnership's sole general partner. The members of the General Partner were Taylor himself, with a 99% member interest, and the Ulric Taylor Descendants Trust, with a 1% member interest.

The Partnership's limited partner interest was divided into two classes of units: Class A units for the principals, and Class B units for employees. Lake Treasure made a capital contribution of $2 million and received 32% of the Class A units. Yar personally made a capital contribution of $40,000 and received 2% of the Class A units. Taylor held the remaining 66% of the Class A units. Employees who subsequently left the business briefly owned Class B units; for purposes of this litigation, they can be ignored.

3

To pursue the algorithmic trading business, Taylor and Yar formed Foundry Hill Trading LLC ("Trading LLC"). The Partnership received a 66 2/3% member interest in Trading LLC. Lake Treasure received the remaining 33 1/3% member interest in return for a capital contribution of $300,000. Taylor controlled Trading LLC through his control over the Partnership.

Taylor and Yar created an additional entity CP-1, LLC ("CP-1"), a Delaware limited liability company, to hold the intellectual property that they expected the Partnership to develop. CP-1 was a wholly owned subsidiary of the Partnership. CP-1 entered into an Intellectual Property Assignment and License Agreement with Foundry Hill Capital, dated July 14, 2008, which licensed Foundry Hill to use CP-1's intellectual property.

## B.    The Initial Efforts at Algorithmic Trading

As planned, Taylor tried to develop an algorithmic trading business. Taylor hired Chris Preston, who developed various computer trading models, including programs called Axon, Chi, and Oboe.

In August 2008, Trading LLC engaged in production trading with Axon. Taylor pulled Axon after it failed to produce positive results. The other programs did not fare any better.

During this period, Yar was closely involved with the business. He consulted frequently with Taylor and received regular reports on his progress. He gave Taylor advice and served as counsel to the Partnership for specific purposes, such as negotiations with current or prospective employees, business partners, and vendors.

4

## C.    The High Frequency Trading Business

In April 2009, Taylor met Adam Krauszer, a high frequency trader employed at a major hedge fund. Krauszer gave Taylor a business plan for a high frequency trading business. Taylor discussed the plan with Yar, and they became excited about it. On June 17, 2009, Taylor and Yar met with Maggie, Mary Ann, and Frank McDonald, a Hille family advisor, at the Foundation's offices. Maggie and Mary Ann decided to support the high frequency business.

In October 2009, Taylor formed Foundry Hill Electronic Trading LLC (the "High Frequency LLC"), a Delaware limited liability company, to as the entity for conducting the high frequency trading business. The Partnership was its sole member. Foundry Hill Capital served as its manager, giving Taylor control. The operating agreement specified that the Foundation would invest up to $2.25 million if High Frequency LLC met certain funding milestones, such as executing live trades using a custom-made order management system that Taylor planned to develop.

## D.    Taylor Takes On Overhead

In October 2009, after the Foundation committed to support the high frequency trading business, Taylor signed a five-year lease for 3,760 square feet of Class-A office space on the 55th floor of 300 North LaSalle in Chicago. The lease required a $100,000 security deposit and minimum monthly payments of $9,500 in rent, plus other expenses.

On December 11, 2009, Taylor certified to the Foundation that High Frequency LLC's customized order management system was exceeding expectations, satisfying the

first funding milestone. The Foundation wired the initial $1.5 million of its $2.25 million commitment. Disputes later arose about Taylor's certification.

On January 18, 2010, Taylor leased an additional 4,407 square feet of office space, bringing the total monthly rent to almost $20,000, plus other expenses. At the time, Foundry Hill had three employees.

In April 2010, after months of negotiation, Taylor hired Krauszer. As part of his compensation package, Taylor gave Krauszer a 30% member interest in High Frequency LLC. The Partnership retained the remaining 70%. Krauszer began developing a high-frequency trading model called Bumblebee and later worked on a model called Afterburner.

In June 2010, Bumblebee began live trading. In July 2010, Taylor entered into a contract with GuavaTech, Inc. for a low-latency line running between Chicago and NASDAQ's co-location facility in New Jersey to be used in the high-frequency business. The GuavaTech line cost $75,000 per month for the first three months, $125,000 per month for the next three months, and $250,000 per month during the final six months of the one year contract. Adding in fees and initial charges, the total cost of the contract was $2,375,000, for an average charge of $197,917 per month.

As with the algorithmic trading business, Yar was closely involved with the high frequency business. He consulted frequently with Taylor, provided advice, and served as counsel for specific purposes.

In September 2010, the Foundation decided to provide Taylor with $1 million in trading capital to deploy in high-frequency trading. The Foundation formed WaterColor

Ventures, LLC ("WaterColor") as its vehicle for providing the $1 million. Yar served as manager of WaterColor. Pursuant to a subscription agreement dated September 1, 2010, WaterColor purchased Class A interests in High Frequency LLC, the terms of which were governed by a certificate of designation. Among other things, the certificate of designations stated that WaterColor's trading capital could be traded only using the "Class A Strategy," meaning high-frequency trading. The certificate of designation authorized Taylor to allocate a portion of High Frequency LLC's overhead expenses to Watercolor's capital account.

In October 2010, Krauszer launched Afterburner in live trading. That same month, Taylor pulled Bumblebee from live trading because of poor performance.

In December 2010, Taylor signed yet another lease with 300 North LaSalle for an additional 3,923 square feet of office space. By the end of 2010, Foundry Hill's rent was running more than $35,000 per month. At the time, it had eight employees.

In late December 2010, Taylor told Yar that Afterburner had been pulled from live trading because of poor performance.

**E.     The Chess Champions**

Meanwhile, in September 2010, Taylor hired Milton R. Smith, III, as a quantitative trader. Between September 2010 and March 2012, Smith developed a series of trading algorithms known as the Chess Champions. Each algorithm was named for a chess grandmaster: Karpov, Capablanca, Tal, Marshall, Lasker, and Smyslov. The Chess Champions were not high-frequency trading programs. They were computer programs that executed trades according to pre-determined rules:

7

- Karpov used classic trend-following techniques supplemented by indicators about whether a security was overbought or oversold.

- Tal was a trend-following, day-trading model for stock index futures.

- Capablanca was a general-purpose trend-following model for stock index futures.

- Lasker was a selective trend-following system that used basic elements like a trailing stop loss and a profit target.

- Smyslov traded based on the twice-daily price fixes in the London gold market.

- Marshall resembled the other models but added features to prevent the premature closing of a position.

Smith wrote the source code for the Chess Champions on a platform called TradeStation using EasyLanguage. To engage in trading using the Chess Champions, Smith used a retail platform called NinjaTrader.

Given the poor results of the high-frequency trading business, Taylor asked Yar to let him trade WaterColor's capital using the Chess Champions. Yar agreed.

## F.     A Falling Out

In February 2011, Taylor made a capital call on the Foundation for an additional $250,000. The Foundation provided it, but Maggie and Mary Ann were becoming concerned. Mary Ann testified that she expected to see a profit within six months after the Foundation's original investment, and Maggie testified about growing impatient with Taylor and Foundry Hill. They had good reason to ask questions. By this point, the Foundation had invested $4.4 million and provided another $1 million in trading capital, but had nothing to show for it. That said, the evidence indicated that building a high frequency trading business was projected to be a capital intensive undertaking. With the benefit of hindsight, it seems likely that Taylor and Yar convinced Maggie and Mary Ann

8

to invest, but that Maggie and Mary Ann did not fully understand (or later became uncomfortable with) the extent of the startup costs. Regardless, matters soon took a turn for the worse.

On March 15, 2011, Maggie, Mary Ann, Yar, and McDonald traveled to Chicago to meet with Taylor in Foundry Hill's offices. They found a dismaying scene. Taylor had not kept electronic records, and his filing system for paper records consisted of a single, over-stuffed, and disorganized file folder that contained invoices interspersed with restaurant menus and various owners' manuals, plus several years' worth of envelopes stacked against his office wall. If Taylor's operation had projected competence and organization, perhaps the Foundation representatives would have been reassured. Instead, their fears appeared justified.

Yar and McDonald returned for additional meetings with Taylor. They collected checkbooks and other documents and took them back to Tulsa to examine.

That same month, Taylor made another $250,000 capital call on the Foundation. The Foundation wired $150,000 to the High Frequency LLC on April 1, 2011. Shortly thereafter, Taylor demanded an additional $350,000. The Foundation responded him that the earlier capital contributions, combined with various letters of credit provided for the Partnership's benefit, had satisfied the Foundation's obligations.

At this point, the relationship between the Foundation and Foundry Hill broke down. Maggie and Mary Ann no longer trusted Taylor. Yar was caught between his wife and mother-in-law on one side and the college friend he had backed on the other. Yar sided with his family and employer, and his interactions with Taylor became combative.

9

On May 20, 2011, the Foundation and Yar gave Taylor written notice that they believed he had breached his fiduciary duties. At the same time, WaterColor demanded the return of its trading capital via a repurchase of its Class A Interests. Taylor responded that WaterColor's capital account had a balance of $0 such that WaterColor was "not entitled to any payment whatsoever in consideration for its Class A Interest." JX 156.

## G.    This Lawsuit

In June 2011, the plaintiffs filed their original complaint in this action, which asserted claims against Taylor for fraud, breach of contract, and breach of fiduciary duty and sought, among other things, the dissolution of the Partnership and the appointment of a liquidating receiver. Discovery revealed that in May 2011, as the dispute between the Foundation and Taylor was coming to a head, Smith deployed the Chess Champions in live trading. Between June and November 2011, the Chess Champions generated a trading profit of more than $500,000. Taylor calculated that the results equated to an annualized trading return in excess of 200%. Smith achieved these results using a retail trading platform, and Taylor believed the results could have been better with a professional-grade order management system.

Taylor decided that he wanted, above all else, to secure control of the Chess Champions for himself. In an email to his advisors discussing a potential deal with the Foundation, he wrote:

> The more I think about it the more I really want to keep [the Foundation] away from the work we are running right now - the Chess Champions models. I can sacrifice the high frequency work, especially if we retain a copy or license to it.

10

> Either way, the high frequency IP is not essential right now, and the Chess Champions are.

JX 159. If the Partnership had been dissolved and liquidated, as the plaintiffs sought, the Partnership Agreement called for the assets to be distributed in accordance with the partners' capital contributions. The Chess Champions and the Partnership's other intellectual property ("IP") would go to the Foundation.

In December 2011, Taylor began talking with Klee, a long-time friend whom Taylor thought of as a brother, about investing in Foundry Hill. Up to this point, Taylor had discussed the progress of the Partnership periodically with Klee, and Klee had considered having Taylor manage his personal investments, but Klee had not considered investing. Klee became interested in investing after Taylor sent him a profit and loss statement showing the Chess Champions' $500,000 profit and a research report showing the spectacular results generated by backtesting.

Klee and Taylor discussed having Klee invest between $300,000 and $500,000 in return for 10-15% of the Partnership, implying a valuation for the business of approximately $3 million. Since the only part of the business that appeared profitable was the Chess Champions, the implied value of the business was synonymous with the implied value of those programs. But Klee saw the Partnership's overhead as a barrier to its success. In an email to Taylor, Klee wrote:

> Not to beat a dead horse, but we really need a solution to the huge monthly overhead expense which is my single biggest concern as a potential investor and in my opinion is the single biggest impediment to your survival. A $500k investment could be drained in just a few short months if ac[c]ounts of significant size do not come on board AND you have month after month positive results, the latter of which is not a realistic expectation.

11

When I run a similar calculation on your business with it's [sic] current capital reserves, it does not appear sustainable. Worst case scenario is that my investment will simply postpone the inevitable. Not because your business does not have the ability to succeed, but because it will be dragged down by unsustainable overhead without a significant investment.

***

I cannot put into words how impressed I am at the Chess Champs performance, and I'm excited about the other models that are in development now, and extremely excited about just being a part of a business with such incredible potential and with a trusted great friend. In this regard I feel very grateful and fortunate, but I do not want to throw a hail mary pass, and you do not want me to throw a hail mary pass so we really need to come up with a plan to address overhead.

JX 198. At the time, Klee calculated that Taylor had taken on approximately $60,000 in recurring monthly expenses, including $35,000 in rent and $15,000 in equipment leases.

Klee, Taylor, and Taylor's personal attorneys at Katten Muchin Rosenman LLP ("Katten") held a call to discuss potential business solutions to their predicament. One of the Katten lawyers suggested that Klee purchase the Partnership's IP for $500,000. Later, after Taylor had resolved the lawsuit with the Foundation, Taylor would "call the IP back and convert [Klee's] IP ownership into a 15% ownership stake." JX 203. The substance of the transaction would be the same: Klee would purchase a 15% stake in Taylor's business for $500,000, implying a value of approximately $3 million. Tactically, the deal would be accomplished by transferring the IP to Klee, thereby achieving Taylor's goal of keeping the Foundation away from the Chess Champions models.

During the same period, Klee formed Chess Champions LLC and Chess Champions LP as vehicles to raise capital for the Partnership to trade using the Chess

Champions algorithms. Klee was the manager of Chess Champions LLC, which was the general partner of Chess Champions LP. Klee anticipated contributing a portion of his retirement funds to Chess Champions LP and raising additional funds from friends and family. The Partnership would trade the capital of Chess Champions LP pursuant to a trading advisory agreement under which the Partnership would receive 50% of the net trading profits.

## H.     The Aborted Sale, The Loan, And The Amicable Foreclosure

In February 2012, Taylor and Klee attempted to effectuate a transfer of the Partnership's IP in the manner suggested by the Katten lawyer, but for only $28,000—a fraction of the $500,000 they previously contemplated. In an email to Taylor dated February 7, 2012, Klee stated:

> Per our conversation, [Klee's company,] Progressive Packaging Corp. [will] be wiring $28,000 today to Foundry Hill Capital, LLC for its payroll obligation because Foundry Hill has no other options for meeting this obligation and is facing the real possibility of having to cease business operations . . . you are authorized and agree to accept this $28,000 from Progressive Packaging Corp as payment for the purchase of the Chess Champions portfolio of algorithmic trading models that are currently owned by CP-l, LLC. Progressive Packaging agrees to lease back the Chess Champions portfolio of algorithmic trading models to Foundry Hill Trading, LLC. exclusively for $5,000 per month and Foundry Hill Holdings has the option to buy back the Chess Champions portfolio of trading models at any time for the total amount paid to Progressive Packaging Corp.

JX 240. Progressive Packaging Corporation was an Illinois corporation, wholly owned and managed by Klee, through which Klee conducted his principal business. Taylor's reply was telling. Rather than raising any objection to the economics, he replied that the

13

purchase would encompass all of the Partnership's IP, not just the Chess Champions. JX 241. Progressive Packaging wired $28,000 to the Partnership that day.

The next morning, Klee and Taylor participated in a conference call with Katten about whether Klee's $28,000 investment should be framed as a loan or a sale. Katten observed that Section 6.1(e) of the Partnership Agreement did not give the General Partner the authority to execute a sale of Partnership assets without the Foundation's consent, so the transaction should be restructured as a loan. Less than two hours after the call with Katten, Taylor sent an email to Klee stating: "After further review, I don't think I am authorized to make a sale transaction of this type. This will have to be a loan, with the amount wired to apply to the loan amount." JX 244.

Taylor and Klee subsequently documented the loan through a promissory note and security agreement. Klee filed a UCC financing statement with the Delaware Secretary of State to perfect his interest in the IP. Over the following weeks, Klee wired the Partnership additional sums, eventually totaling $175,073.75. Taylor used virtually all of the funds to meet payroll. Taylor did not make any payments on the Partnership's office lease or its equipment leases. Klee later assigned his interest in the promissory note and security agreement to Progressive Packaging.

Under the original promissory note, the Partnership would not owe any amounts until February 2013. In mid-April, Progressive Packaging and Taylor executed a letter agreement that required the Partnership to pay interest in May 2012. They backdated the letter agreement to March 21, 2012.

14

Less than one week after executing the modification agreement, on April 25, 2012, Klee instructed Taylor to stop trading Klee's capital with the Chess Champions. Klee and Taylor agreed to spend two to three months re-optimizing the Chess Champions so that they could be redeployed.

During the same period, Taylor and Klee discussed with Greg Veselica of Buttonwood Group Trading LLC ("Buttonwood") the possibility of Taylor and Smith working for him and "get[ting] Chess Champions back to trading profitably." JX 365 at CKPPC002494. At Veselica's request, on May 3, 2012, Taylor sent a written proposal titled the "Taylor/Klee proposal" to Veselica. JX 364. The proposal stated that Taylor and Klee would bring Foundry Hill's IP, including the Chess Champions, to Buttonwood, plus more than $1 million in trading capital, in exchange for Buttonwood paying operational expenses and providing office space and IT support for Taylor and Klee's new company. Taylor and Klee told Veselica that they would wind down Foundry Hill and create a new entity to "enter into the deal with Buttonwood." *Id.*

Around May 15, 2012, Taylor abandoned the Partnership to work as a "senior trader" for Buttonwood. JX 369. Taylor convinced Smith, who was unaware of Taylor and Klee's dealings, to come to work at Buttonwood at the same time.

On May 22, 2012, Klee wrote to Taylor, declared the Partnership in default, and stated that he was foreclosing on the loan from Progressive Packaging. On May 24, 2012, two days after declaring the purported default, Taylor asked an attorney for "a quote for setting up the new LLC, to be called Triple Line Trading LLC." JX 375. Taylor

introduced Klee as his "partner" and explained that the Partnership "ha[d] ceased doing business and [would] be dissolving soon." *Id.*

In June, the Partnership and Progressive Packaging executed a Collateral Surrender Agreement pursuant to which the Partnership surrendered all of its assets to Progressive Packaging to satisfy $100,000 of the $136,200 due under the loan. The balance remained outstanding. No one notified the court, the plaintiffs, or the Foundation about the transaction.

## I.     Triple Line Trading and the Philosopher Kings

Triple Line Trading was formed during this period. Taylor prepared drafts of an operating agreement under which Taylor and Klee would be Class A members and Smith would be a Class B member. The operating agreement contemplated that Klee would receive his interests in return for the IP formerly held by the Partnership, including the Chess Champions. Smith would receive a Class B interest. Klee never signed the operating agreement, but he anticipated receiving a membership interest, and he contributed $120,000 to Triple Line Trading. Consistent with the draft agreement, Taylor and Smith continued using the Partnership's computer equipment and intellectual property, including the Chess Champions. The virtually identical Trader Agreements that Taylor and Smith entered into with Buttonwood represented that Triple Line Trading, not Progressive Packaging, owned the Partnership IP.

When Smith began working at Buttonwood, Taylor, Klee, and Veselica directed him to redeploy the Chess Champions onto a new platform called RTD Tango. Toward that end, Smith first developed general-purpose libraries and intelligent order handling

16

algorithms to assist with actual trading. Then, Smith redeployed two of the Chess Champions—Marshall and Lasker—onto the RTD Tango Platform.

Triple Line Trading began trading at Buttonwood in September 2012 using the re-deployed Chess Champions algorithms. On September 18, 2012, after live trading had resumed, Taylor sent Klee a "[r]evised Chess Champions report" for the "Chess Champions Algorithms: Lasker, Tal, Capablanca, Marshall, Smyslov." JX 398 at CKPPC002269. Taylor wrote in the report that "[t]hese algorithms and the work preceding them were successfully traded at our predecessor company as the Diversified Portfolio (including Karpov) for the last six months of 2011." *Id.* at CKPPC002270.

Trading went well during the next couple of months with actual results tracking projected results. Then, over Thanksgiving weekend, Taylor instructed Smith to liquidate all his positions. Buttonwood had suffered a funding crisis and, by the first week of December 2012, had fired virtually all of its employees, including Taylor and Smith. Buttonwood allowed Taylor and Smith to continue working out of its offices, and Smith used the time to redeploy the other Chess Champions onto RTD Tango and enhance the models.

By December 2012, Klee and Taylor were discussing Triple Line's business nearly every day. Seeking trading and investment capital from a packaging industry colleague, Klee drafted an email describing the actual trading results and historical backtesting analysis for the Chess Champions. This was accurate. The evidence at trial established that the Taylor and Klee continued using the Chess Champions but called

17

them the Philosopher Kings, and that although the programs evolved, the Philosopher Kings were always derived from the Chess Champions.

After reviewing Klee's email, Taylor "reminded" Klee that they were "NOT trading the Chess Champions models, as those [were] dormant," but they were trading the "new models named 'Philosopher Kings.'" JX 406. This was false. Taylor wanted Klee to state that the Philosopher Kings were different than the Chess Champions to insulate the models from claims by the plaintiffs and other creditors.

## J.    A Further Round of Transfers

In April 2013, Klee and Taylor caused Progressive Packaging to loan Triple Line $5,000 in return for a promissory note. As with the earlier promissory note between the Partnership and Progressive Packaging, the new promissory note was secured by all of Triple Line's intellectual property.

On April 17, 2013, Taylor and Smith went to work with 303 Proprietary Trading LLC ("303 Proprietary"). Smith had resumed trading Klee's account in January 2013, and he now also traded an account for 303 Proprietary. For both, Smith used the redeployed Chess Champions algorithms, now called the Philosopher Kings. Taylor and Smith used the redeployed programs in live trading until September 2013 when 303 Proprietary terminated Taylor and Smith.

In September 2013, Taylor and Smith began trading an account for a London-based investment group called ISAM using the Philosopher Kings. On October 29, 2013, Taylor stopped trading ISAM's capital.

**K.** **Trial**

As noted, the plaintiffs initially filed suit on June 2011. Discovery was lengthy and contentious, with the plaintiffs eventually learning in early 2013 about Taylor's transactions with Klee involving the Chess Champions. The plaintiffs updated their complaint, and the operative pleading for purposes of trial contained claims for fraudulent transfer and misappropriation of trade secrets against Taylor and claims for aiding and abetting breaches of fiduciary duty and tortious interference with contract against Klee. The case proceeded to trial on March 31 through April 2, 2014.

## II. LEGAL ANALYSIS

The plaintiffs proved at trial that Taylor breached his duty of loyalty and that Klee aided and abetted Taylor's breach. The plaintiffs did not, however, prove that the Partnership suffered any compensable damages. As a remedy, the Partnership is awarded nominal damages of $1.

The plaintiffs proved at trial that Taylor and Klee caused the Partnership to engage in a fraudulent transfer by which Progressive Packaging gained title to the Chess Champions software and derivative works, including the Philosopher Kings. As a remedy, Taylor and Klee shall cause the Chess Champions software, the Philosopher Kings software, and all related code to be restored to the Partnership. Klee's loan to the Partnership in the amount of $136,200, together with any interest, is equitably subordinated to the claims of all other creditors.

The plaintiffs proved their entitlement to have the Partnership dissolved. They did not establish an entitlement to any other relief.

19

## A. Breach of Fiduciary Duty and Aiding and Abetting

The plaintiffs' most straightforward claims are for breach of fiduciary duty against Taylor and for aiding and abetting a breach of fiduciary duty against Klee. The plaintiffs proved both claims.

As the general partner of the Partnership, the General Partner owed fiduciary duties to the Partnership for the benefit of all of its limited partners. *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("Unquestionably, the general partner of a limited partnership owes direct fiduciary duties to the partnership and to its limited partners."). As the party who controlled the General Partner, Taylor owed a fiduciary duty of loyalty which required that he act in the best interests of the Partnership for the ultimate benefit of its limited partners. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271 (D. Del. 1989); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 666-71 (Del. Ch. 2012). The duty of loyalty obligated Taylor and the General Partner "not to use [their] control over the partnership's property to advantage [themselves] at the expense of the partnership." *Wallace*, 752 A.2d at 1180.

Delaware's default standard of review for fiduciary decision-making is the business judgment rule. The rule presumes that when making a decision, the fiduciary acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the entity. Entire fairness is Delaware's most onerous standard of review. It applies when a plaintiff rebuts one or more of the presumptions of the business judgment rule. Once entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair

20

price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted) (emphasis in original).

> The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed . . . , and how the [necessary] approvals . . . were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of [the interest in the entity]. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (internal citations omitted).

The plaintiffs proved at trial that Taylor orchestrated for his own benefit the series of transactions by which the Partnership transferred the Partnership's IP, including the Chess Champions, to Progressive Packaging and then to Triple Line Trading. Through those transactions, Taylor placed what he believed was the only "essential" asset of the Partnership, JX 159, in the hands of a friend who was like a brother to him, expecting that they later would form a new entity in which Taylor would own a majority stake so they could use the IP for their mutual advantage. Because of Taylor and Klee's plan to create a new entity that would use the IP, Taylor stood on both sides of the loan transaction by which Progressive Packaging acquired its rights in the IP, then again stood on both sides of the Collateral Surrender Agreement by which Taylor caused the Partnership to surrender the IP amicably to Progressive Packaging.

Taylor failed to prove that the Partnership's transfer of the IP to Progressive Packaging was entirely fair. Taylor did not follow any process designed to achieve a fair price or otherwise ensure the fairness of the transaction. Taylor does not appear to have

21

bargained at arms' length with Klee. To the contrary, in lieu of the $500,000 payment that Taylor and Klee originally discussed, Taylor accepted $28,000. Although there was a possibility that Klee might provide more money, and although he ultimately advanced $175,073.75, nothing required that he provide more than the initial $28,000. Taylor again negotiated backwards, although to a lesser extent, regarding the scope of Klee's rights. Klee originally stated that he was purchasing only the Chess Champions for $28,000. Taylor countered that the sale would cover all of the Partnership's IP. Shortly thereafter, when Katten advised that Taylor did not have authority to sell the IP, Taylor did not seize the opportunity to negotiate better terms. He simply accepted the same amount of funds from Klee, but now in the form of a loan secured by all of the Partnership's assets.

The terms of the loan agreement permitted Klee to foreclose in the event the Partnership became unable to pay its debts as they became due. JX 242, § 8(b). The Partnership relied on Klee's loan to make payroll, and Klee knew the Partnership was not making payments on its office lease and equipment leases. Klee could thus declare a default and obtain title to the Partnership's IP from the moment was loan was extended. When Klee declared a default in May 2013, Taylor did not resist or attempt to negotiate the value of the collateral that Klee took. Klee specified a total loan amount of $136,000 and decided the collateral would offset $100,000 of that amount, and Taylor signed the Collateral Surrender Agreement agreeing to those terms. By contrast in January 2013, Taylor and Klee were contemplating Klee investing $300,000 to $500,000 for a 10-15% stake in the Partnership, implying a value of approximately $3 million for the Partnership and the Chess Champions, which was the Partnership's only valuable asset.

22

The transfer of the Partnership's IP to Klee was not entirely fair to the Partnership, and Taylor breached his duty of loyalty by engaging in the transaction. For similar reasons, the plaintiffs proved that Klee aided and abetted Taylor's breach of the duty of loyalty. The elements of an aiding and abetting claim are "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, … (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotations omitted). The analysis of the breach of fiduciary duty claim against Taylor shows that the first two elements are met. The third element, knowing participation, "requires that the nonfiduciary act with the knowledge that the conduct advocated or assisted constitutes . . . a breach." *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009). Section 876 of the RESTATEMENT (SECOND) OF TORTS states that a defendant can be liable for "harm resulting ... from the tortious conduct of another" if the defendant:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or

> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Id.* § 876.

In this case, Klee is jointly liable with Taylor under Section 876(a) for engaging in a tortious act "in concert with" Taylor and "pursuant to a common design with him."

23

During an initial call with Taylor's personal lawyer at Katten to brainstorm potential business solutions, Klee and Taylor came up with the scheme of transferring the Partnership's IP to Klee. Later, after they learned during a second call with Katten that Taylor could not transfer the IP, they decided to structure the transaction as a loan. The series of transactions that led to the transfer of the Chess Champions from the Partnership, to Klee, to Preferred Packaging, to Triple Line Trading was part of a common design by which Taylor and Klee acted in concert to move the Partnership's IP out of the Partnership and into an entity where Taylor and Klee could enjoy its benefits.

Although Klee denied participating in the scheme at trial, the objective evidence proves otherwise. "[I]n some circumstances, the nonfiduciary's actions may be so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." *Triton Constr.*, 2009 WL 1387115, at *16. Knowledge also can be inferred from the circumstances. *Cf.* 11 *Del. C.* § 307(a) ("The defendant's intention, recklessness, knowledge or belief at the time of the offense for which the defendant is charged may be inferred by the jury from the circumstances surrounding the act the defendant is alleged to have done."); *In re Bailey*, 821 A.2d 851, 863 (Del. 2003) (explaining in context of attorney disciplinary proceeding that "[b]ecause a person is presumed to intend the natural consequences of his or her actions, we have held that 'knowing' misconduct may be inferred from the circumstances.").

Klee was intimately involved in Taylor's plan. Klee reviewed a copy of the Partnership Agreement and understood that Taylor owed fiduciary duties to the Partnership. Klee participated in a brainstorming call with Taylor and his counsel where

24

they came up with the idea of having the Partnership sell Klee its IP, then later participated in a call with Katten after which the transaction was re-structured as a loan. Klee knew that he had been contemplating an investment of $300,000 to $500,000 in return for a 10-15% equity stake in the Partnership, yet shortly thereafter he acquired its only valuable asset in return for a $28,000 loan. Klee assisted Taylor in making his pitch to Buttonwood, which rested on Taylor's ability to use the Chess Champions, and Klee participated with Taylor in the formation of Triple Line Trading so that the two of them could benefit from the Partnership's IP. The evidence establishes Klee's knowledge of and participation in Taylor's self-interested transfer of the Partnership IP. Klee and Taylor's knowledge is imputed to Progressive Packaging and Triple Line Trading, respectively, as entities that they controlled.

The final requirement for the plaintiffs to obtain a monetary recover on their claims for breach of fiduciary duty and aiding and abetting is proof of quantifiable damages that are "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006). "The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002).

The plaintiffs failed to provide a basis for a responsible estimate of damages reasonably related to the injuries that the Partnership suffered from Taylor's breaches of

25

fiduciary duty, aided and abetted by Klee. The plaintiffs argued at trial that without Klee's involvement, the Partnership would have dissolved, and the Foundation would have received the Partnership's IP in the liquidation. The Foundation then could have used the Chess Champions to generate trading profits, which the plaintiffs' expert projected would yield investment returns of $2.3 million to $29 million over a two year period. This damages theory is too speculative to support relief.

First, the plaintiffs claim that they would have invested $2 to $4 million dollars to trade using the Chess Champions, if the software had been available. The plaintiffs' past behavior undercuts this claim. When Taylor previously sought additional capital from the Foundation, the plaintiffs refused to provide it. They were entitled not to throw good money after bad, and it was understandable for them not to want to back Taylor after his trading strategies had failed repeatedly. This history, however, renders suspect the plaintiffs' contention at trial that they would have provided $2 to $4 million to trade using the relatively untested Chess Champions programs. It also renders doubtful their ability to stomach the volatility of the Chess Champions' trading results. For purposes of a damages calculation, this decision will not credit the plaintiffs with an outsized figure that would have depended on the existence of committed trading capital that they were unlikely to provide.

Second, the plaintiffs' expert derived his anticipated returns from the Chess Champions' backtested results, but he did not establish that his backtesting provided a sufficiently reliable indicator of future performance on the facts of this case. The wide range of potential results provides little guidance, essentially inviting the court to pick a

26

number between $2.3 million and $29 million. The actual performance of the algorithms differed significantly from the backtested results, and except for one exceptional period from June to November 2011, the algorithms lost money. Klee never made a profit. The evidence at trial established that the performance of even successful algorithms deteriorates over time, rendering it speculative that the Chess Champions could have retained an edge over a two-year period. The defendants' expert further undercut the reliability of the projected returns by explaining that the Chess Champions consisted primarily of simple arrangements of public domain components, such that it was unlikely that the Chess Champions could provide a sustained advantage over time.

Because the plaintiffs failed to provide a basis for a responsible estimate of damages reasonably related to their injuries from the breach of fiduciary duties, this decision awards nominal damages of $1.00 for the breach of fiduciary duty and aiding and abetting claims.

## B.     Other Theories Supporting Monetary Damages

In addition to their claims for breach of fiduciary duty and aiding and abetting, the plaintiffs sought to recover monetary damages from the defendants under alternative theories of breach of contract, tortious interference with contract, and civil conspiracy grounded in the same facts. Assuming the alternative theories have merit, the plaintiffs failed to prove non-speculative damages, so their recovery is limited to nominal damages. This decision therefore does not separately analyze the plaintiffs' alternative theories.

## C.     Fraudulent Transfer

The plaintiffs claim that the defendants violated DUFTA by engaging in fraudulent transfers. "DUFTA provides remedies to creditors who are defrauded by debtors who transfer assets or incur obligations [with, inter alia,] actual intent to hinder, delay or defraud any creditor of the debtor." *In re Mobilactive Media, LLC*, 2013 WL 297950, at *30 (Del. Ch. Jan. 25, 2013) (internal quotation marks omitted). DUFTA defines a creditor as "a person who has a claim." 6 *Del. C.* § 1301(4). Claims include the "unliquidated, contingent, disputed, unsecured right to payment" in lawsuits such as this one. *Mobilactive*, 2013 WL 297950, at *31. DUFTA defines the concept of "transfer" broadly as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." 6 *Del. C.* § 1301(12). The transfer of the Partnership's IP to Progressive Packaging pursuant to the Collateral Surrender Agreement constituted a fraudulent transfer under Section 1304(a)(1) of DUFTA. *Id* § 1304(a)(1).

Section 1304(a) identifies two grounds on which a transfer could be fraudulent as to both present and future creditors. The first ground, set forth in Section 1304(a)(1), states:

> (a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1)  With actual intent to hinder, delay or defraud any creditor of the debtor . . . .

28

6 *Del. C.* § 1304(a)(1). Section 1304(b) of DUFTA identifies a non-exclusive list of factors for a court to consider when evaluating "actual intent." They include whether:

(1)  The transfer or obligation was to an insider;

(2)  The debtor retained possession or control of the property transferred after the transfer;

(3)  The transfer or obligation was disclosed or concealed;

(4)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)  The transfer was of substantially all the debtor's assets;

(6)  The debtor absconded;

(7)  The debtor removed or concealed assets;

(8)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* § 1304(b). "It is not necessary that all of the factors support a finding of actual intent. Rather, the confluence of several factors in one transaction generally provides conclusive evidence of an actual intent to defraud." *Mobilactive*, 2013 WL 297950, at \*31 (footnotes and internal quotation marks omitted).

The plaintiffs proved at trial that Taylor acted with actual intent to defraud the Partnership's creditors, including the plaintiffs, when he agreed to the $28,000 loan with

29

Klee and subsequently agreed to the Collateral Surrender Agreement. The transfer of the Partnership's IP represented substantially all its assets, and the only assets that Taylor thought had value. *See Id.* § 1304(b)(5). At the time of the transfer, the Partnership was insolvent and unable to pay its debts as they became due. *See id.* § 1304(b)(9). The value of the consideration received by the Partnership was only $28,000, representing a fraction of the $300,000 to $500,000 that Taylor and Klee had been discussing and less than 1% of the implied value for the Partnership and its IP of approximately $3 million. *See id.* § 1304(b)(8). Taylor transferred the Partnership's essential assets to Klee, having used precisely that term ("essential") when referring to the Chess Champions in an email to his advisors, and Klee later transferred the IP to Triple Line Trading, an entity that Taylor formed. *See id.* § 1304(b)(11). After the transfer, Taylor and Smith continued using the IP. *See id.* § 1304(b)(2). At the time of the transfer, Taylor was in the midst of this litigation. *See id.* § 1304(b)(4). Rather than disclosing the transfer, Taylor concealed it. *See id.* § 1304(b)(7). Perhaps most tellingly, Taylor stated in an email to his advisors that he wanted to prevent the Foundation from gaining access to the Chess Champions algorithms. JX 159. Taylor acted with actual intent to hinder, delay, and defraud the Partnership's creditors, thereby violating Section 1304(a)(1).

As a defense to the plaintiffs' claims, Klee relies on Section 1308(a) of DUFTA, which states: "A transfer or obligation is not voidable under § 1304(a)(1) of this title against a person who took in good faith and for a reasonably equivalent value." 6 *Del. C.* § 1308(a). The plaintiffs proved at trial that Klee did not act in good faith. He conspired with Taylor to obtain title to the Chess Champions, extract them from a failing entity, and

use them through Triple Line Trading. Klee also did not provide reasonable equivalent value for the Partnership's IP. At the time, Klee and Taylor believed (incorrectly) that the Chess Champions algorithms were valuable. They had contemplated Klee receiving a 10-15% equity interest in the Partnership in return for an investment of $300,000 to $500,000, implying a value for the Partnership of approximately $3 million. Klee and Taylor later contemplated having Klee buy the IP for $500,000. Shortly thereafter, Taylor granted Klee a security interest in all of the Partnership's IP, including the Chess Champions, in return for a loan of $28,000, plus a non-binding opportunity to provide more funding. Although Klee eventually provided loan proceeds of $175,073.75, that amount was not reasonably equivalent to what Klee and Taylor believed the Chess Champions were worth. Klee cannot rely on a good faith defense.

As a remedy, the plaintiffs seek avoidance of the transfer and an order that the defendants "hold in constructive trust and turn over to the Partnership all the Partnership assets, including the Partnership IP and any derivatives." DUFTA contemplates remedies that include the "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." 6 *Del. C.* § 1307(a)(1). DUFTA grants a court "broad latitude" for the court to craft a remedy to "put a creditor in the position she would have been in had the fraudulent transfer not occurred." *August v. August*, 2009 WL 458778, at *10 (Del. Ch. Feb. 20, 2009) (Strine, V.C.). "Delaware courts utilize the equitable remedy of imposing a constructive trust when one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another and where other legal

31

remedies are inadequate." *Wilm. Sav. Fund Soc., FSB v. Kaczmarczyk*, 2007 WL 704937, at *3 (Del. Ch. Mar. 1, 2007).

As a remedy for Taylor's fraudulent transfer of the Partnership's IP to Klee, Taylor and Klee shall hold in a constructive trust for the benefit of the Partnership all of the Partnership's IP, including the Chess Champions, the Philosopher Kings, and any related software. The so-called Philosopher Kings are encompassed by the constructive trust because the plaintiffs proved at trial that the Philosopher Kings were versions of the Chess Champions. Taylor and Klee shall take all steps necessary to restore the Partnership's title to the Partnership IP. All transactions by which Taylor and Klee transferred the Partnership IP out of the Partnership, and all subsequent transactions by Taylor and Klee are void. As a consequence of the rescission of these transactions, Klee has an unsecured claim against the Partnership in the amount of $175,073.75, which is equitably subordinated so that it is junior to all other creditors of the Partnership but senior to the Partnership's equity investors.

## D. Misappropriation of Trade Secrets

Because title to the Partnership's IP properly rests with the Partnership, the plaintiffs assert a claim for misappropriation of trade secrets under DUTSA. To maintain such a claim, the plaintiffs must show that the Chess Champions qualified as trade secrets under DUTSA, which defines that term as

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means

32

by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 *Del. C.* § 2001(4). Even if parts of a process are publicly known, "[t]he combination of steps into a process" may qualify as a trade secret, "so long as it is a unique process which is not known in the industry." *Merck & Co. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, at \*15-16 (Del. Ch. Aug. 5, 1999) (internal quotations omitted).

The defendants' expert explained convincingly at trial that the Chess Champions primarily comprised components taken from the public domain. He further explained that the arrangements of the public domain elements in the Chess Champions were elementary, even simplistic, and that similar arrangements are widely discussed in publicly available literature and on the internet. As noted, I approached trial skeptical about his testimony, because everyone in the case had acted as if the Chess Champions algorithms were trade secrets with substantial value. In November 2012, as part of a discovery dispute, Taylor had submitted a sworn declaration stating that all of the Partnership's IP constituted protectable trade secrets, including the Chess Champions source code, notes relating to the source code's development, and manuals relating to the source code. He testified in deposition that the Chess Champions were trade secrets. There was also contemporaneous evidence that the Partnership regarded the Chess Champions as trade secrets: during development, Smith saved all of his work (including models that were not used in live trading) and testing results to the Partnership's encrypted Subversion repository. Other security measures included (i) not allowing

33

employees to take source code or backtesting results out of the office, (ii) not allowing employees to email source code, (iii) using encrypted thumb drives to transfer code, and (iv) requiring confidentiality agreements from employees, consultants, and potential investors.

The evidence as a whole established that Taylor subjectively believed that the Chess Champions were trade secrets, treated them as such, and convinced Klee of that fact. An expert in the field, however, could readily determine that the Chess Champions were not unique, not sophisticated, and not trade secrets. The defendants retained such an expert, who analyzed the programs, reached those conclusions, and explained his analysis persuasively at trial. The defendants proved that the Chess Champions did not qualify as a trade secret. Relief under DUTSA is therefore unavailable.[1]

### E.      Dissolution

The plaintiffs ask that the court order the Partnership dissolved and appoint an independent liquidating trustee to wind up the Partnership's affairs. Section 9.1 of the Partnership Agreement provides that the Foundation can require that the Partnership be

---

[1] A fair analogy would be if a renter discovered an old document in the attic of his landlord's building, concluded that it was a copy of the Declaration of Independence from 1776, but never had its authenticity tested. Assume the renter acted as if the document were authentic, such as by purchasing an expensive, climate-controlled encasement to protect it. Assume the renter convinced a friend of its authenticity, that they recognized that the landlord would have a claim to the document, and that they manufactured an alternative story about the document's provenance to support their own claim of title. Now assume that in eventual litigation with the landlord over ownership of the document, a forensic examiner tested the document and established that it was a modern facsimile, cleverly done, but reproducible by anyone with an art school degree, access to period paper and some chemicals, and the ability to follow instructions available on the internet. For the renter and his friend to have believed sincerely that the facsimile was the genuine article, and to have acted consistently with their convictions, would not require the court to find that the facsimile was, in fact, a copy of the Declaration of Independence from 1776. The same is true here.

34

dissolved if either Taylor or the General Partner commits a breach of fiduciary duty. This decision has found that such a breach occurred, making dissolution appropriate. In addition, the plaintiffs have shown good cause for appointing of a liquidating trustee under 6 *Del. C.* § 17-803(a). The parties shall confer and attempt to reach agreement on a liquidating trustee. If they are unable to do so, the plaintiffs shall submit three names to the court.

As part of the liquidation process, the trustee shall determine what expenses should be allocated to WaterColor's capital account. The plaintiffs proved at trial that Taylor did not use reasonable discretion to allocate expenses to WaterColor's capital account and that the capital account was burdened with excessive allocations. Rather than making a good faith allocation, Taylor allocated 100% of a number of categories to WaterColor, including expenses incurred before WaterColor provided trading capital to the Partnership. The liquidating trustee will address the allocation of expenses to WaterColor's capital account without giving any deference to Taylor's allocation.

### III.   CONCLUSION

The Partnership is awarded nominal damages of $1. The transfer of the Partnership IP is rescinded, and Taylor and Klee shall take all steps necessary to return the Partnership IP to the Partnership. Pending the return of the Partnership IP, Taylor and Klee hold the Partnership IP in a constructive trust for the benefit of the Partnership. The Partnership is dissolved. The plaintiffs are awarded costs as prevailing parties. Counsel shall submit a form of order implementing the rulings in this decision.

35